**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **OLALEKAN OGUNDAIRO,**<br>**Petitioner,**<br><br>**v.**<br><br>**J.L. JAMISON, U.S. IMMIGRATION & CUSTOMS ENFORCEMENT, DAVID VENTURELLA, MARKWAYNE MULLIN, TODD BLANCHE,**<br>**Respondents.** | **CIVIL ACTION**<br><br>**NO. 26-7681** |

**MEMORANDUM**

**HODGE, J.** **November 17, 2026**

## I. INTRODUCTION

The Immigration and Nationality Act ("INA") governs immigration in the United States.[1] The INA is an intricate mechanism that establishes a pathway to lawful permanent residency and/or citizenship for noncitizen aliens while simultaneously empowering the federal Government to protect those who reside in the United States by removing certain noncitizens and by limiting entry for violent and other known criminal aliens. *See generally* Immigr. & Nationality Act, 8 U.S.C. § 1101 *et seq.* (as amended through Pub. L. 119-21). Since the 1990s, amendments to the INA have largely related to safety and, in the wake of the September 11, 2001 terrorist attack, antiterrorism. *See, e.g.*, 1990 Immigration Act, 104 Stat. 4978; Violent Crime Control and Law

---

[1] In 1952, Congress enacted the INA in an effort to consolidate and reorganize U.S. immigration law amidst the end of World War II and the beginning of the Cold War. *See* Major U.S. Immigration Laws, 1790 – Present, Migration Policy Inst. (Mar. 2013), https://www.migrationpolicy.org/sites/default/files/publications/CIR-1790Timeline.pdf. The INA has been amended numerous times, with notable amendments occurring in 1965, 1986, 1990, 1996, and 2002, and the most recent changes (mainly related to appropriations) implemented in 2025. *See* Immigr. & Nationality Act, 8 U.S.C. § 1101 *et seq.* (as amended through Pub. L. 119-21); *see also* Act of July 4, 2025, 139 Stat. 72, Pub. L. No. 119-21, https://www.congress.gov/119/plaws/publ21/PLAW-119publ21.pdf.

Enforcement Act, 108 Stat. 1791; Antiterrorism and Effective Death Penalty Act, 110 Stat. 1214; Illegal Immigration Reform and Immigrant Responsibility Act, 110 Stat. 3009; USA Patriot Act, 115 Stat. 272; Homeland Security Act, 116 Stat. 2135; REAL ID Act, 119 Stat. 302. The federal regulations setting forth the procedures for apprehension, custody, and detention of noncitizen aliens were adopted in March 1997 and have not been substantially modified since December 2000, over twenty-five years ago. *See* 8 C.F.R. §§ 236.1(a)–(d), 1236.1(a)–(d); *see also* Note to 8 C.F.R. § 236; Note to 8 C.F.R. § 1236.1.

Since its enactment, the Supreme Court and the Third Circuit have consistently interpreted the INA and its implementing regulations as imposing reasonable limitations on the government's ability to detain noncitizen aliens residing in the United States, including by applying the strictures of due process under the Constitution. *See, e.g.*, *Kwong Hai Chew v. Colding*, 344 U.S. 590, 602–03 (1953) ("[W]e conclude that the detention of petitioner, without notice of the charges against him and without opportunity to be heard in opposition to them, is not authorized by [the applicable regulation]."); *Mathews v. Diaz*, 426 U.S. 67, 77 (1976) ("There are literally millions of aliens within the jurisdiction of the United States. The Fifth Amendment . . . protects every one of these persons from deprivation of life, liberty, or property without due process of law."); *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("[T]he Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent."); *Buele Morocho v. Warden Phila. FDC*, 189 F.4th 287, 305–06 (3d Cir. 2026) (collecting cases, and stating that the Supreme Court has "recognized that other noncitizens 'who have established connections in this country have due process rights in deportation proceedings'" (quoting *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103 (2020))).

Now, the Government, relying on executive orders and reported changes to agency policy, has begun re-detaining—and, in some instances, detaining for the first time—noncitizen, non-criminal aliens without regard for process or an alien's lawful presence in the United States. In the case before the Court, Respondents[2] arrested and detained Petitioner Olalekan Ogundairo without properly initiating removal proceedings, adhering to the procedural sequence prescribed by regulations, or providing an individualized determination as to the need for detention. Such conduct not only violates the statutory provisions of the INA (and its regulations) but also subverts the constitutional requirements of procedural due process. Therefore, for the reasons set forth below, as well as the reasons stated on the record following the hearing on the Petition held on October 19, 2026 (*see* ECF Nos. 12, 14), the Emergency Verified Petition for Writ of Habeas Corpus and Complaint for Declaratory and Injunctive Relief (the "Petition") (ECF No. 1) is **GRANTED**. In light of the Court's October 6, 2026 Order (ECF No. 3) and because the Court grants the Petition, the contemporaneously filed Application for Order to Show Cause (the "Application") (ECF No. 2) is **DENIED AS MOOT**. (*See also* ECF No. 11.)

## II. BACKGROUND

### A. Factual Background[3]

Respondents do not dispute the facts as stated in the Petition (*see generally* ECF Nos. 5, 8) and on the record (*see, e.g.*, Tr. at 8:23–21:11), and, therefore, the Court accepts them as true.[4] Dr.

---

[2] Respondents in the present action are J.L Jamison, Warden of the Federal Detention Center-Philadelphia; U.S. Immigration and Customs Enforcement, Enforcement and Removal Operations; David Venturella, Acting Director of ICE; Markwayne Mullin, Secretary of the U.S. Department of Homeland Security; and Todd Blanche, Attorney General of the United States.

[3] The Court adopts the pagination supplied by the CM/ECF docketing system. Citations to "Tr." refer to the transcript of the October 19, 2026 hearing on the Petition and Application. (ECF No. 14.)

[4] The Court recognizes and emphasizes that the unique factual circumstances of a Petition are critical to whether an arrest and detention comply with both Petitioner's constitutional rights

Olalekan Ogundairo, Ph.D. ("Petitioner" or "Dr. Ogundairo") is a citizen of Nigeria. (ECF No. 1 ¶ 13.) He entered the United States lawfully in August 2019 pursuant to an F-1 student visa[5] to pursue a Ph.D. in electrical engineering at the University of North Carolina Charlotte. (*Id.* ¶ 23; *see also* ECF No. 1-3 (Form I-94 setting an "admit until date" of "D/S," or duration of status as a student).) Dr. Ogundairo completed his doctoral degree on December 16, 2023. (ECF No. 1 ¶ 24.) He maintained lawful F-1 student status through at least February 8, 2025, by participating in an authorized "Optional Practical Training" ("OPT") post-doctoral program. (*Id.*) Respondents submit that Petitioner's F-1 visa student status expired on April 10, 2025, when he "completed his studies." (ECF No. 5 at 6; ECF No. 5-3 at 3.)

On July 20, 2024, Dr. Ogundairo married Motunrayo Yewande Adleye, a U.S. Citizen. (ECF No. 1 ¶ 25; ECF No. 1-15 at 2.) Together, Dr. Ogundairo and his wife have established their roots in Dallas, Texas, where they purchased a house together in August 2025. (ECF No. 1 ¶ 25; *see also* ECF No. 1-14 at 2.) On October 7, 2024, Dr. Ogundairo's wife filed a Form I-130, Petition for Alien Relative. (ECF No. 1 ¶ 26; *see* ECF No. 1-12.) According to the Form I-130, Dr. Ogundairo's wife paid the $625.00 filing fee and indicated that the application was based on

---

and the statutory provisions of the INA. Such key facts distinguish each matter from others adjudicated by the district courts in this and other Circuits around the country.

[5] An F-1 Student Visa is a nonimmigrant visa issued for full-time students enrolled in an academic educational program approved by ICE's Student and Exchange Visitors Program. *Students and Employment*, U.S. Citizenship & Immigr. Servs. (Nov. 20, 2025), https://www.uscis.gov/working-in-the-united-states/students-and-exchange-visitors/students-and-employment. F-1 visa status typically lasts for the "duration of status"—that is, for the duration of the visa holder's enrollment as a full-time student or in qualifying off-campus employment. *See id.*; *see also Change of Status, Extension of Stay, and Length of Stay*, USCIS Policy Manual (Oct. 27, 2026), https://www.uscis.gov/policy-manual/volume-2-part-f-chapter-8.

The U.S. Department of State website notes that if an F-1 student visa holder's "plans change while in the United States (for example, you *marry a U.S. citizen or receive an offer of employment*), you may be able to request a change in your nonimmigrant status to another category . . . ." Student Visa, Travel.State.Gov, U.S. Dep't of State, https://travel.state.gov/content/travel/en/us-visas/study/student-visa.html (last visited Nov. 6, 2026) (emphasis added).

§ 201(b) of the INA.[6] (ECF No. 1-12 at 2.) Dr. Ogundairo filed a separate Form I-485, Application to Register Permanent Residence or Adjust Status (ECF No. 1 ¶ 26), and paid the $1,440.00 fee. (ECF No. 1-17 at 2.) Both the Form I-130 and Form I-485 have a "Priority Date" of October 7, 2024. (*Id.*; ECF No. 1-12.) The filing of the Form I-485 prior to the termination of his F-1 student visa granted Dr. Ogundairo continuous legal presence in the United States during the pendency of his Form I-485 application, even though he lacked legal status after his F-1 visa expired. (Tr. at 9:18–12:3.)

On April 24, 2026, U.S. Citizenship and Immigration Services ("USCIS") issued a Form I-797C Notice of Action to Dr. Ogundairo titled "Request for Applicant to Appear for Initial Interview" (the "Notice"). (ECF No. 1 ¶ 26; ECF No. 1-5 (Form I-797C, Notice of Action).) In the Notice, USCIS set an interview date of Friday, May 29, 2026, at 12:50 p.m., for Dr. Ogundairo to appear before a USCIS officer about his pending Form I-485 application. (ECF No. 1-5 at 2.) The Notice required Dr. Ogundairo to go to the USCIS location in Irving, Texas, and provided him with a checklist of items and other materials and/or people to bring to the interview on the scheduled date (including, if applicable, his wife). (*Id.* at 2–3.) Dr. Ogundairo and his wife attended the interview as scheduled. (ECF No. 1 ¶¶ 26–28.) Dr. Ogundairo alleges that "[a]t the conclusion of the May 26 (*sic*), 2026 interview, the USCIS officer informed Dr. Ogundairo and his wife that

---

6 Section 201(b) of the INA, codified at 8 U.S.C. § 1151(b), states that aliens who are the "immediate relatives" of a U.S. citizen, including the spouse of a U.S. citizen, are "not subject to direct numerical limitations" typically imposed upon those seeking to immigrate to the United States. 8 U.S.C. § 1151(b)(2)(A)(i). The U.S. Citizenship and Immigration Services ("USCIS") website also indicates that an immigrant visa is "always available" for immediate relatives, such as spouses, of U.S. citizens. *Green Card for Immediate Relatives of U.S. Citizen*, U.S. Citizenship & Immigr. Servs. (Jan. 30, 2026), https://www.uscis.gov/green-card/green-card-eligibility/green-card-for-immediate-relatives-of-us-citizen.

he had 'passed' the interview and would be issued a green card."[7] (*Id.* ¶ 28.) As of the date of Dr. Ogundairo's arrest by ICE, the Form I-130 and Form I-485 applications remained pending.[8]

Dr. Ogundairo obtained work authorization in late 2024 and holds a current employment authorization card, valid from December 20, 2024, through December 19, 2029. (ECF No. 1 ¶¶ 2, 42; ECF No. 1-4 at 4.) He holds a valid driver's license, issued by the state of Texas on September 1, 2025—after his F-1 student visa apparently expired. (ECF No. 1-4 at 5–6; Tr. at 30:17–31:2.) Dr. Ogundairo is employed as a Senior Software Architect for General Electric, a position he has held since January 2026. (ECF No. 1 ¶ 27.) As counsel for Respondents recognized, Dr. Ogundairo's lengthy *curriculum vitae* reflects an "impressive background" replete with "highly

---

[7] Respondents do not dispute that this interview occurred, and they provide no additional argument or information as to the content of the interview and any determinations, records, or other administrative notes that may have been documented as a result of the hearing.

[8] Dr. Ogundairo contends that his "adjustment case remained pending during a separate USCIS benefits hold policy that directly applied to domestic immigration applications filed by nationals of Nigeria." (ECF No. 1 ¶ 29; *see also* ECF 1-6.) Dr. Ogundairo argues that while his I-485 application "could be processed and interviewed, USCIS could not issue a final decision during the hold" as a result of the change in policy. (ECF No. 1 ¶ 29.) Dr. Ogundairo states that this change in policy—described as a "benefits hold policy"—was "vacated" and that "related nationality-based USCIS adjudication policies" were held unlawful in a June 5, 2026 decision from the District of Rhode Island. (*Id.* (citing *Dorcas Int'l Inst. of R.I. v. U.S. Citizenship & Immigr. Servs.*, 834 F. Supp. 3d 242 (D.R.I. June 5, 2026)).)

In *Dorcas International Institute*, the court held that USCIS lacked statutory authority to implement the benefits hold policy and further determined that the policy was arbitrary and capricious. 834 F. Supp. 3d at 308–09, 317–24; *see also id.* at 324 (citations omitted) ("To summarize, the Court finds that each of the Challenged Policies violate the APA. First, the Global Asylum Hold Policy, the Benefits Hold Policy, the Comprehensive Re-Review Policy, and the Country-Specific Factors Policy (particularly with respect to adjustment of status and employment authorization claims) are contrary to law. And second, the Challenged Policies are collectively arbitrary and capricious because USCIS: (1) failed to provide a reasoned explanation for enacting the policies; (2) failed to account for reliance interests in enacting the policies; and (3) provided a pretextual reason for enacting the policies."). In August 2026, the First Circuit granted in part a stay of the decision pending appeal. *Dorcas Int'l Inst. of R.I. v. U.S. Citizenship & Immigr. Servs.*, 186 F.4th 883 (1st Cir. 2026) (mem.). The First Circuit stayed the district court's opinion and order only as to the Comprehensive Re-View Policy not at issue in the present matter before the Court. *Id.* Accordingly, the USCIS policy remains vacated as the benefits hold policy.

technical" expertise that is currently being used to the benefit of a United States-based company. (Tr. at 35:3–35:11; *see also* ECF No. 1-9 (Dr. Ogundairo's four-page-long curriculum vitae).) Dr. Ogundairo has no criminal record. (ECF No. 1 ¶¶ 4, 31–32, 42, 58.) Further, there was no removal order nor ongoing removal proceedings prior to Dr. Ogundairo's October 3, 2026 arrest. (*Id.* ¶ 4.)

On October 3, 2026, Dr. Ogundairo was at the Philadelphia International Airport with his wife, scheduled to return home to Texas from a business trip. (ECF No. 1 ¶¶ 5, 30.) At approximately 3:30 p.m., upon exiting the restroom, U.S. Immigration and Customs Enforcement ("ICE") agents arrested him, placing him in handcuffs and ankle shackles. (*Id.* ¶ 30.) Dr. Ogundairo's arrest, as Respondents concede, was "profoundly humiliating," "terrifying," and "emotionally traumatic" for both him and his wife. (*Id.* ¶ 31; Tr. at 32:8–25.) Dr. Ogundairo asserts that the ICE agents "did not identify themselves, did not show him an arrest warrant, and did not provide the paperwork that would permit him or his wife to understand the basis for the arrest." (ECF No. 1 ¶ 31.) Respondents contend that "Petitioner was encountered at the Philadelphia International Aiport on October 3, 2026, as part of a targeted enforcement operation" (ECF No. 5 at 14)—specifically, as part of Operation TSA Secure Flights.[9] (ECF No. 9-1 at 1.) This case was allegedly referred to ICE by the ICE Philadelphia Fugitive Unit, which had learned that Petitioner was "scheduled to depart the Philadelphia International Airport on a *domestic* flight" after ICE Enforcement and Removal Operations ("ERO") received a lead through "TSA PERC."[10] (ECF

[9] At the October 19 hearing, counsel for Respondents could not explain what "Operation TSA Secure Flights" is. (Tr. at 33:9–20.)

[10] Counsel for Respondents was also unable to explain when the purported "lead" was received, who received the information, and from whom the information came. (Tr. at 23:15–25:12.) Instead, counsel for Respondents relied entirely on a declaration prepared by Deportation Officer Rodney Gaddis, the officer who served Dr. Ogundairo with a Form I-200 arrest warrant, a Notice to Appear, and a Form I-286 Notice of Custody Redetermination after Dr. Ogundairo had been arrested and taken into ICE custody. (ECF No. 9-1 at 2.) But Officer Gaddis did not execute

No. 5-3 at 2 (emphasis added); ECF No. 9-1 at 1; Tr. at 23:23–24:3.) The Form I-213, Record of Deportable/Inadmissible Alien, states that Petitioner was "identified from known photos" before being placed under arrest by ICE agents for overstaying his visa. (*Id.* at 2–3.) The Form I-213 further reports that Petitioner "will be detained without bond at this time" with no additional basis for that determination. (*Id.* at 4.)

Respondents concede that a warrant was not shown to Petitioner until *after* his arrest on October 3, 2026,[11] but nonetheless maintain that an administrative warrant was indeed issued that same day. The initial "partially completed" administrative Form I-200 Warrant for Arrest of Alien—submitted to the Court on October 9, 2026—did not identify the basis for the probable cause determination that Dr. Ogundairo was removable.[12] (ECF No. 5-2; Tr. at 24:7–25:4.) It was

---

or file those documents, and he lacked personal, firsthand knowledge of the information apparently relied upon by the executing officers. The following exchange occurred on the record:

> THE COURT: And so ***someone made a determination, we don't know who, at some point in time, and we don't know what information they received or when they received that information***, it could have been 6 months before, 10 months before, 10 hours before, ***we don't know, but they relied on that*** and said, "We're going to go ahead and arrest this individual flying out of Philadelphia back to Dallas, Texas," correct?
>
> MS. KAPLAN: ***Correct***.

(Tr. at 25:5–12 (emphasis added).)

[11] Respondents initially represented that Petitioner's allegation that the warrant and NTA "were not shown to him until after his arrest" was "contradicted by the documentary record and disputed by ICE." (ECF No. 5 at 6.) However, in their surreply, Respondents clarify:

> Based on information initially provided by ICE, Respondents represented that Petitioner was served with the I-200 before his arrest . . . . ***ICE has since clarified that, although the I-200 was generated before Petitioner's arrest, it was not served on Petitioner until he was processed later that day.*** Respondents accordingly correct their earlier representation to reflect this clarification.

(ECF No. 8 at 1 (emphasis added).)

[12] A Form I-200 Warrant for Arrest of Alien lists five itemized reasons, each with a checkbox, that an authorized immigration officer may identify as bases for the determination that there is probable cause to believe an alien is removable from the United States. *See, e.g.*, U.S. Immigr. & Customs Enf't, *U.S. Dep't of Homeland Sec. I-200 Warrant of Arrest of Alien Sample* (rev. Sept. 2016), https://www.ice.gov/sites/default/files/documents/Document/2017/I-200_SAMPLE.PDF.

dated October 1, 2026, and signed by Supervisory Detention and Deportation Officer ("SDDO") Patrick McCallion. (ECF No. 5-2; Tr. at 25:12–15.) Even though the "partially completed warrant" was apparently prepared on October 1, 2026, ICE officers "did not have their warrant in hand on October 3" at the time of Dr. Ogundairo's arrest. (*Id.* at 21:23–24, 38:21–23.) A revised warrant, reportedly "generated after Petitioner's processing," was submitted to the Court on October 15, 2026. (ECF No. 8.) The revised "completed warrant" offers three bases for the probable cause determination, including "the execution of a charging document to initiate removal proceedings against the subject," and was signed by SDDO Timothy Sullivan on October 3, 2026, with a timestamp of 6:45 p.m. (ECF No. 8-1; Tr. at 26:12–24.)[13]

Dr. Ogundairo alleges that ICE issued a Notice to Appear ("NTA") only *after* his arrest. (ECF No. 1 ¶ 32.) The NTA indicates that Dr. Ogundairo is removable for overstaying his nonimmigrant F-1 Student Visa after the "temporary period not to exceed April 10, 2025," in violation of "Section 237(a)(1)(B) of the [INA]."[14] (ECF No 1-13 at 2.) The NTA ordered Dr. Ogundairo to appear before an immigration judge at 625 Evans Street, Room 148A, Elizabeth, New Jersey 07201, at 1:00 p.m. on October 14, 2026.[15] (*Id.*) The NTA was signed by SDDO Sullivan and dated October 3, 2026, with a timestamp of 6:48 p.m. (*Id.*; *see also* ECF No. 5-4.)

---

Counsel for Respondents was unable to justify why the determination checkboxes on the original Form I-200 warrant were left unchecked. (Tr. at 26:1–10; *see also* ECF No. 5-2.)

[13] Once again, counsel for Respondents could not explain when, nor from whom, SDDO Sullivan acquired information that enabled him to check off the boxes on the Form I-200 warrant. (Tr. at 26:12–24.)

[14] Section 237(a)(1)(B) is codified at 8 U.S.C. § 1227.

[15] Respondents contend that a bond hearing "will be scheduled once [court-imposed transfer] restrictions are lifted," apparently indicating that no such hearing has yet been scheduled *despite* the date certain for a hearing listed in the NTA. (ECF No. 5 at 9.)

Petitioner was held at the Federal Detention Center-Philadelphia ("FDC") following his arrest on October 3, 2026, until the Court ordered his immediate release at the conclusion of the hearing on October 19, 2026. (*See* ECF No. 1 ¶ 54; Tr. at 43:21–24; ECF No. 11.)

**B. Procedural History**

The Petition and Application for Order to Show Cause (the "Application") (ECF No. 2) were filed contemporaneously on October 6, 2026. The same day, the Court issued an Order directing Respondents to (1) not transfer Petitioner, and (2) respond to the Petition by October 9, 2026. (ECF No. 3.) Counsel entered their appearance on behalf of Respondents on October 8, 2026. (ECF No. 4.) Respondents filed a timely Answer to the Petition on October 9, 2026. (ECF No. 5.) Petitioner filed a reply in support of his Petition on October 13, 2026. (ECF No. 6.) Also on October 13, 2026, the Court filed an Order scheduling a hearing on the pending Petition and Application. (ECF No. 7.) Respondents filed a surreply in opposition to the Petition on October 15, 2026. (ECF No. 8.) They also filed Supplemental Evidence on October 19, 2026, providing a Declaration of Deportation Officer Rodney Gaddis (the "Gaddis Declaration") in support of their opposition to the Petition. (ECF No. 9.) The Court held a hearing on the Petition and Application on October 19, 2026.[16] (ECF No. 12.) The Petition is now ripe for disposition.

---

[16] The Court notes that, at the hearing, Petitioner arrived in shackles that were not removed upon entering the courtroom. Counsel for Respondents indicated that they believed that it was ICE's "standard operating procedure for officer safety" to shackle detainees. (Tr. at 6:9–23.) Representatives of the U.S. Marshal's Service indicated that they typically unshackle detainees when they enter the courtroom but that the Marshal officer indicated they did not have to do so for Dr. Ogundario. (*Id.* at 7:9–16.) As the Court ordered on the record, in any future proceedings involving Dr. Ogundairo or others in a similar posture, the Court directs the Government to notify the Court in advance of any hearing as to whether the petitioner should or needs to be shackled in the courtroom. (*Id.* at 7:21–8:4). Unless information indicates otherwise—such as a reported elevated safety concern for the Court, its participants, or the petitioner—or there is an explicit policy in place requiring that a petitioner be shackled, the Court expects that petitioners will not be shackled in the courtroom. (*Id.*)

## III. LEGAL STANDARD

A federal district court is authorized to grant a writ of habeas corpus under 28 U.S.C. § 2241 where the petitioner is "in custody under or by color of the authority of the United States . . . ." The burden is on the petitioner to show that his confinement is unlawful. *Goins v. Brierley*, 464 F.2d 947, 949 (3d Cir. 1972).

## IV. DISCUSSION

Dr. Ogundairo seeks habeas relief on two primary grounds: first, he argues that his detention is unlawful in violation of the INA; and second, he argues that his detention violates the Fifth Amendment guarantees of procedural due process. Dr. Ogundairo also requests injunctive relief prohibiting his transfer out of this District, which the Court granted on October 6, 2026. (*See* ECF No. 3.) Respondents oppose habeas relief, contending that (1) Dr. Ogundairo is lawfully detained under 8 U.S.C. § 1226(a), (2) he has failed to exhaust administrative remedies, and (3) Dr. Ogundairo's detention does not violate procedural due process. (*See* ECF No. 5.) The Court finds that Respondents have failed to act in a humane, appropriate, and procedurally correct manner, thereby violating both the statutory provisions of the INA and its implementing regulations in addition to violating Dr. Ogundairo's due process rights. (Tr. at 43:13–20.) The Court begins with exhaustion before addressing the statutory and constitutional issues in turn.

### A. Dr. Ogundairo Is Excused From Exhausting Administrative Remedies

Habeas petitioners "are ordinarily required to exhaust their administrative remedies" before seeking relief from the courts. *Moscato v. Fed. Bureau of Prisons*, 98 F.3d 757, 760 (3d Cir. 1996). While 28 U.S.C. § 2241 does not have a statutory exhaustion requirement, courts in this Circuit "have consistently applied an exhaustion requirement to claims brought under § 2241." *Callwood v. Enos*, 230 F.3d 627, 634 (3d Cir. 2000). This prudential requirement may be excused, however,

if any one of following three circumstances are met: (1) "administrative remedies would be futile"; (2) "the actions of the agency clearly and unambiguously violate statutory or constitutional rights"; or (3) "the administrative procedure is clearly shown to be inadequate to prevent irreparable injury." *Lyons v. U.S. Marshals*, 840 F.2d 202, 205 (3d Cir. 1988); *see also Dos Reis v. McShane*, No. 26-cv-03775, 2026 WL 1746649, at *4 (E.D. Pa. June 17, 2026) (Sánchez, J.) (asserting that "[e]xhaustion under § 2241 is therefore prudential" and may be excused where one of the *Lyons* factors is satisfied). "[T]he exhaustion doctrine is not supposed to preclude judicial relief." *Lyons*, 840 F.2d at 205.

In this case, the Court finds that administrative remedies "would be futile" and that Respondents have "clearly and unambiguously violate[d]" Dr. Ogundairo's statutory and constitutional rights. Courts in this District have determined that "[a] later bond hearing does not necessarily cure the alleged constitutional violation that preceded it." *Lopez-Lopez v. Jamison*, No. 26-cv-07618, 2026 WL 3094744, at *3 (E.D. Pa. Oct. 16, 2026) (Kenney, J.) (quoting *Dos Reis*, 2026 WL 1746649, at *3). Here, Respondents unlawfully detained Dr. Ogundairo in contravention of his procedural due process rights under the Fifth Amendment, and Respondents clearly violated 8 U.S.C. § 1226(a) by detaining Dr. Ogundairo in reliance on a warrant deficient on its face and without an individualized custody determination. *See infra* Sections IV.B, IV.C. Administrative remedies would therefore be futile to "remedy[] Petitioner's alleged present and ongoing constitutional deprivation." *Melendez-Guzman v. Jamison*, No. 26-cv-07556, 2026 WL 2983704, at *3 (E.D. Pa. Oct. 5, 2026) (Rufe, J.). Accordingly, it is appropriate to excuse exhaustion here.[17]

---

[17] Respondents urge the Court to apply administrative exhaustion as a bar to Dr. Ogundairo's Petition based on the Court's previous decision in *Carillo Gomez v. Jamison*, No. 26-cv-03879, 2026 WL 1959116 (E.D. Pa. July 6, 2026). However, *Carillo Gomez* is inapposite to the matter currently before the Court. In *Carillo Gomez*, Petitioner challenged the sufficiency of the bond hearing that he received in accordance with § 1226(a). *Id.* at *3 ("Petitioner no longer challenges

### B. Dr. Ogundairo's Detention Is Unlawful in Violation of 8 U.S.C. § 1226(a)

Section 236 of the INA, codified at 8 U.S.C. § 1226, provides: "On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States."[18] Detention under § 1226(a) is discretionary, and "[t]he initial custody determination requires 'an individualized determination as to . . . whether the noncitizen is a 'danger to property or persons' and is 'likely to appear for any future proceeding.'" *Regalado-Nauta v. Jamison*, No. 26-cv-06834, 2026 WL 2740528, at *3 (E.D. Pa. Sept. 16, 2026) (alteration in original) (Beetlestone, C.J.) (quoting *Lopez Benitez v. Francis*, 795 F. Supp.3d 475, 492–93 (S.D.N.Y. Aug. 13, 2025)). This determination cannot rely on the generalized findings that an alien lacks citizenship or lawful status, that an alien is "subject to President Donald Trump's Executive Order, titled 'Protecting the American People Against Invasion,'" and that there is "availability of bed space" in an ICE or DHS detention facility. *Lursmanashvili v. Jamison*, No. 26-cv-07716, 2026 WL 3123167, at *2 (E.D. Pa. Oct. 19, 2026) (Henry, J.). Rather, the

---

his initial detention but instead focuses on the result of the bond hearing . . . ."). Indeed, Petitioner had asked the Court to vacate its Order prohibiting transfer outside of this District, and in doing so, "Petitioner acknowledged that there was an administrative remedy available to him and recognized a need to exhaust that procedure, and he opted to engage in that procedure." *Id.* That is not so for Dr. Ogundairo, who had not yet had a bond hearing scheduled by the October 19 hearing.

[18] 8 U.S.C. § 1357(a)(2) permits the arrest without a warrant of "any alien in the United States, if [the DHS officer] has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest." In such circumstances, the alien must "be taken ***without unnecessary delay*** for examination before an officer of [DHS] having authority to examine aliens as to their right to enter or remain in the United States." *Id.* (emphasis added). The implementing regulations specify that this determination as to "whether the alien will be continued in custody or released on bond or recognizance and whether a notice to appear and warrant of arrest . . . will be issued" must, except in limited circumstances not applicable here, be made "***within 48 hours of the arrest***." 8 C.F.R. § 287.3(d) (emphasis added). 8 C.F.R. § 287.3 specifically incorporates by reference the implementing regulations associated with 8 U.S.C. § 1226(a) regarding the issuance of warrants of arrest and notices to appear. *See* ECF No. 5 at 16 n.3; *see also* 8 C.F.R. § 287.3(d) ("[A] determination will be made . . . whether a notice to appear and warrant of arrest as prescribed in 8 CFR parts 236 and 239 will be issued.").

individualized determination must reflect some "reasoned finding that Petitioner is dangerous or a flight risk, or unsuitable for conditions short of detention." *Regalado-Nauta*, 2026 WL 2740528, at *3 (quoting *Dos Reis*, 2026 WL 1746649, at *4); *see also Dos Reis*, 2026 WL 1746649, at *4 ("A decision [to detain an alien] driven by a general executive directive, without a reasoned assessment of Petitioner's particular risk of flight or danger, therefore does not comply with § 1226(a).").

Furthermore, the INA's implementing regulations set forth the procedure for issuing a warrant under § 1226(a). The administrative Form I-200, Warrant of Arrest of Alien, may be issued by an authorized immigration officer "[a]t the time of issuance of the notice to appear, or at any time thereafter and up to the time removal proceedings are completed." 8 C.F.R. § 236.1(b)(1); *id.* § 1236.1(b)(1). Because a notice to appear ("NTA") is a "case-initiating document" that "serves as the basis for commencing a grave legal proceeding," *Niz-Chavez v. Garland*, 593 U.S. 155, 163–64 (2021), the statute and its implementing regulations recognize that a warrant for arrest cannot be issued before removal proceedings have even begun. *See Lopez-Lopez*, 2026 WL 3094744, at *3 ("When [8 U.S.C. § 1226(a) and 8 C.F.R. § 236.1(b)(1)] are taken together, they indicate that 'DHS may arrest a non-citizen using a Form I-200 ***only if the Form I-200 issues at the same time or after DHS issues an NTA***.'" (emphasis added) (quoting *Vladimir G. v. Easterwood*, No. 26-cv-2971, 2026 WL 1786418, at *2 (D. Minn. June 22, 2026))). Warrants issued prior to an NTA are generally "deemed invalid," thus rendering detention unlawful in violation of the INA. *Id.* at *4 (collecting cases).

As a threshold matter, Dr. Ogundairo's arrest on October 3, 2026, was effectively a warrantless arrest. Not only did ICE agents "not have [the October 1] arrest warrant in hand at the time of the arrest on October 3" (Tr. at 21:20–24), but counsel for Respondents conceded that the

October 1 warrant was not validly executed. (*Id.* at 33:18–34:16.) Indeed, the "partially completed warrant," as counsel described it, was dated October 1, 2026, signed by SDDO McCallion, and failed to indicate any basis for Respondents' apparent determination that there was probable cause to believe that Dr. Ogundairo was removable from the United States. (*Id.* at 37:24–38:6; *see also* ECF No. 5-2.) Petitioner aptly asserts, and the Court agrees, there is no such thing as a valid, "partially completed warrant" (Tr. at 18:7–13); there is either a completed warrant or an incomplete, invalid warrant. (*Id.* at 34:13 (counsel for Respondents agreeing with the Court's recitation that, at the time of Dr. Ogundairo's arrest, ICE officers had "no warrant in hand that ha[d] been validly executed").) Thus, even if it had been properly served upon Dr. Ogundairo at the time of his arrest, the October 1, 2026 "partially completed warrant" is "deficient on its face." (*Id.* at 42:10–12.)

A warrantless arrest under 8 U.S.C. § 1357 and its implementing regulation, *see, e.g.*, 8 C.F.R. § 287.3(d), does not absolve Respondents of their obligation to comply with the requirements of § 1226(a) and its implementing regulations. Section 1357 is merely a vehicle through which Respondents may detain an alien under § 1226(a), but with a post-arrest individualized custody determination (within forty-eight hours of arrest). The Court recognizes that Respondents technically provided a Form I-200 warrant and an NTA to Dr. Ogundairo within forty-eight hours of his arrest. However, the Court questions whether Respondents complied with 8 C.F.R. § 236.1(b)(1) because the NTA is clearly timestamped *after* the timestamp of the signature on the "completed warrant" signed and dated October 3, 2026,[19] *see supra* § II.A—and

[19] Additionally, the Court is dubious, at best, that the October 3, 2026 "completed" Form I-200 warrant is accurate with respect to the bases for the removability determination. The warrant indicates that probable cause that Dr. Ogundairo was removable was based, at least in part, on "the execution of a charging document to initiate removal proceedings against the subject" (ECF No. 8-1), but *no such document existed* at the time that the "completed" warrant was issued.

the NTA had not been issued on October 1, 2026, when the "partially completed" warrant was signed. (Tr. at 42:8–10.) Respondents' failure to adhere to the INA's regulations, on its own, provides the Court with a basis to grant the Petition. *See Lopez-Lopez*, 2026 WL 3094744, at *3–6 (granting habeas petition where Form I-200 Warrant was issued prior to notice to appear).

Regardless, Respondents nonetheless failed to make an individualized custody determination as required by § 1226(a). The Form I-213 Record of Deportable/Inadmissible Alien summarizes Dr. Ogundairo's immigration history, noting his arrival in August 2019 pursuant to an F-1 student visa, his pending Form I-485, and the expiration of his F-1 student visa in April 2025. (ECF No. 5-3 at 2.) It further states that Dr. Ogundairo has "no legal status in the United States at this time" and "is removable pursuant to Section 237(a)(2)(B)" of the INA after his student status and visa expired. (*Id.* at 3.) The Form I-213 notes the disposition as: "Ogundairo is subject to President Donald Trump's Executive Order titled, 'Protecting the American People Against Invasion,' signed on January 20, 2025. . . . Ogundairo will be detained without bond at this time." (*Id.* at 3–4.) This is precisely the generalized finding, relying on an executive directive, that other courts in this District have routinely found insufficient to sustain detention under § 1226(a). *See, e.g.*, *Lursmanashvili*, 2026 WL 3123167, at *2; *Regalado-Nauta*, 2026 WL 2740528, at *3; *Dos Reis*, 2026 WL 1746649, at *4. Moreover, the Form I-213 contains no information specific to Dr. Ogundairo that suggests that he is, in any way, an "invader" from whom the American people need "protection," as the title of the Executive Order states. In fact, Dr. Ogundairo's presence in the United States has demonstrated behavior that is quite to the contrary. He has pursued higher education, married a U.S. citizen, purchased a home, maintained gainful employment, paid taxes, and more. In short, Dr. Ogundairo has been a model individual and contributing member of society. Thus, the Court concludes that Respondents have failed to

demonstrate that an individualized determination was made as to Dr. Ogundairo before his arrest and detention, in violation of § 1226(a) and its implementing regulations.

### C. Dr. Ogundairo's Detention Violates Procedural Due Process

The Due Process Clause provides that "[n]o person" shall "be deprived of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. V. "[T]he Due Process Clause applies to all 'persons' within the United States, *including aliens*, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) (emphasis added). "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects." *Id.* at 690. Indeed, "mandatory detention implicates [habeas] Petitioners' 'constitutionally protected interest in avoiding physical restraint.'" *Buele Morocho*, 189 F.4th at 306 (quoting *Kansas v. Hendricks*, 521 U.S. 346, 356 (1997)). "Due process in the civil immigration detention context requires procedures that are reasonably calculated to avoid erroneous deprivation of liberty." *Regalado-Nauta*, 2026 WL 2740528, at *3 (first citing *Mathews v. Elridge*, 424 U.S. 319, 333–35 (1976); and then citing *Gayle v. Warden Monmouth Cnty. Corr. Inst.*, 12 F.4th 321, 331–32 (3d. Cir 2021)).

The second question before the Court is whether Dr. Ogundairo's civil immigration arrest and detention without bond violates due process, particularly in light of the numerous facts reflecting that Dr. Ogundairo has done everything he believed was necessary to correctly pursue lawful permanent residence after the expiration of his student visa. *See Buele Morocho*, 189 F.4th at 306–07. To evaluate Petitioner's claim, the Court considers the three factors announced by the Supreme Court in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976):

> (1) the private interest that will be affected by the official action, (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards, and (3) the Government's interest, including the function involved and the fiscal and

> administrative burdens that the additional or substitute procedural requirement would entail.

*Buele Morocho*, 189 F.4th at 306 (citation modified) (quoting *Mathews*, 424 U.S. at 335). The Court finds that Dr. Ogundairo's civil immigration detention contravenes the due process to which he is entitled. The Court addresses each *Mathews* factor in turn.

First, Dr. Ogundairo has an essential private interest in maintaining personal liberty free from detention. *See Zadvydas*, 533 U.S. at 690; *see also Lursmanashvili*, 2026 WL 3123167, at *3 ("[Petitioner] has a strong interest in freedom from physical confinement . . . ."). Here, Dr. Ogundairo could have been "detained for months or even years while his case proceed[ed]," and, in such instances, "the restriction of liberty is particularly acute." *Regalado-Nauta*, 2026 WL 2740528, at *4 (quoting *Cunin v. McShane*, No. 25-cv-01887, 2025 WL 3542999, at *2 (M.D. Pa. Dec. 10, 2025)). It is uncontroverted that Dr. Ogundairo was deprived of his personal liberty when he was arrested and detained on October 3, 2026, and that interest remained implicated by his continued detention without an individualized custody determination or a bond hearing. Thus, the first *Mathews* factor weighs in favor of Dr. Ogundairo.

Second, there is a significant risk that Dr. Ogundairo has been erroneously deprived of his fundamental liberty interest. *See Buele Morocho*, 189 F.4th at 307 ("[T]he absence of an opportunity for a neutral decisionmaker to assess whether Petitioners are dangerous or flight risks presents a high risk of erroneously depriving Petitioners of their liberty interest." (citations omitted)); *see also Leng Mey Ma v. Barber*, 357 U.S. 185, 190 (1958) ("Physical detention of aliens . . . is generally employed only as to security risks or those likely to abscond."). ICE officers detained Dr. Ogundairo using a facially defective arrest warrant prior to the issuance of an NTA. The absence of an NTA at the time of Dr. Ogundairo's arrest further indicates that he was not even in active removal proceedings at the time of his arrest and initial detention on the afternoon of

October 3, 2026. At the time of the hearing on the Petition on October 19, 2026, Dr. Ogundairo had not yet been provided with an immigration hearing, despite requesting one and attempting to post bond. Respondents do not argue that Petitioner poses a flight risk or danger to the community. (*See generally* ECF No. 5); *see also De Los Santos Medina v. Jamison*, No. 26-cv-06800, 2026 WL 2742071, at *6 (E.D. Pa. Sept. 16, 2026) (Rufe, J.) ("The risk [of erroneous deprivation] is particularly pronounced where, as here, there is no indication that Petitioner is a danger to the community or a flight risk."). Rather, Respondents contend that "the risk of erroneous deprivation of Petitioner's interest is low because (1) an initial bond hearing is available before a neutral immigration judge, and (2) the immigration-court decision will be subject to BIA review (if Petitioner seeks it)." (ECF No. 5 at 10–11.) However, as noted above, no such hearing had occurred or even been scheduled at the time of the hearing on the Petition on October 19, 2026. Accordingly, Dr. Ogundairo's detention risks erroneously depriving him of his rights, and thus, the second *Mathews* factor weighs in his favor.

Third, the federal government has an important interest in immigration enforcement and public safety. (ECF No. 5 at 11.) In particular, the government has a "legitimate interest in preventing the release of dangerous noncitizens and those who might fail to appear at future hearings." *Buele Morocho*, 189 F.4th at 307. However, this interest fails to outweigh the first two factors where the Petitioner poses neither a flight risk nor a danger to the community. *See id.* On the contrary, the evidence here demonstrates that Dr. Ogundairo seeks to permanently establish his residence in the United States: he owns a home; he pays taxes; he is married to a U.S. citizen; he has both a pending Form I-130 application and a pending Form I-485 application; he punctually attended a USCIS interview in support of his lawful permanent residence applications; he has no criminal record; and he is employed as a senior engineer at General Electric. *See also Regalado-*

*Nauta*, 2026 WL 2740528, at *4 ("[Petitioner], like the petitioners in *Buele Morocho*, is a 'non-criminal individual who was detained absent evidence that he is dangerous or a flight risk.' [Petitioner] presents no risk of failing to appear at future hearings. Indeed, he has regularly reported to ICE check-ins since his initial detention in 2022." (citation modified) (quoting *Buele Morocho*, 189 F.4th at 307)); *De Los Santos Medina*, 2026 WL 2742071, at *6 (finding that "the government's interest in Petitioner's detention is weak" where Petitioner had no criminal record and had a "history of compliance with release condition," and the government did not argue that he was "a danger to the community or a flight risk"). This evidence far exceeds the baseline showing that Dr. Ogundairo is not a flight risk and does not pose a danger to the community. Indeed, as described above, Dr. Ogundairo has been a model individual, believes he has done everything correctly to pursue lawful status, and continues to be nothing but a contributing member of society. (Tr. at 29:7–30: 16.)

In short, all the *Mathews* factors weigh in favor of granting the Petition because Dr. Ogundairo was detained without a bond hearing or an individualized custody determination in contravention of his procedural due process rights. A post-detention bond hearing had not yet been scheduled at the time of the hearing on the Petition on October 19, 2026, and, regardless, would not have been "an adequate substitute for the pre-detention individualized assessment that due process requires . . . ." *De Los Santos Medina*, 2026 WL 2742071, at *7 (citing *Cruz-Reyes v. Bondi*, 818 F. Supp. 3d 875, 885–86 (S.D. Tex. 2026)). This is particularly true in light of the Court's concerns, discussed *supra*, that Respondents inexplicably failed to comply with the statutory and regulatory provisions of § 1226(a), including by relying on a facially defective arrest warrant, and doing so prior to the initiation of removal proceedings.

"Habeas is at its core a remedy for unlawful executive detention," and "[t]he typical remedy for such detention is, of course, release." *Munaf v. Geren*, 553 U.S. 674, 693 (2008). Therefore, the Court concludes that "immediate release is the only appropriate remedy." *Regalado-Nauta*, 2026 WL 2740528, at *4; *see also De Los Santos Medina*, 2026 WL 2742071, at *7 ("As Petitioner's present detention is unconstitutional, the proper remedy is release.").

## V. CONCLUSION

The INA is a complex tool that establishes pathways to lawful residence and citizenship for noncitizens. At the same time, it is a powerful weapon, because it confers great authority on the federal Government to arrest, detain, and remove from the United States those who it believes are present in violation of the immigration laws. However, such power is not without limits, and it is well established that "it is not a crime for a removable alien to remain present in the United States." *Arizona v. United States*, 567 U.S. 387, 407 (2012). Noncitizens with no criminal history, who have pursued education, maintained gainful employment, married U.S. citizens, purchased homes, paid taxes, applied for lawful status, and more—in other words, those who have gone through each of the necessary steps that they believe are required to attain lawful status in this country—should not face the constant fear of arrest and deportation, without warning, merely by walking through an airport. (*See* Tr. at 38:10–39:16.) The Court must uphold the statutory requirements of the INA and shall uphold the due process guarantees of the Constitution, as these are the guardrails that preserve the fabric of American democracy and adherence to the rule of law, which binds citizens, non-citizens, and the Government alike.

Accordingly, for the reasons set forth in this memorandum, in addition to the reasons stated by the Court following the hearing on October 19, 2026 (ECF No. 14), and the Court's October 19, 2026 Order (ECF No. 11),[20] the Petition is granted.

**BY THE COURT:**

**/s/ Hon. Kelley B. Hodge**

**HODGE, KELLEY B., J.**

[20] The Clerk of Court is directed to file this memorandum *nunc pro tunc* to the Court's Order (ECF No. 14) on October 19, 2026.